

**Signed and Filed: April 22, 2010**

_____
**THOMAS E. CARLSON**
**U.S. Bankruptcy Judge**
_____

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re | ) | Case No. 06-30815 TEC |
| | ) | |
| WILLIAM M. HAWKINS, III, aka | ) | Chapter 11 |
| TRIP HAWKINS; and LISA WARNES | ) | |
| HAWKINS, aka LISA A. HAWKINS, | ) | |
| | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| WILLIAM M. HAWKINS, III, and | ) | Adv. Proc. No. 07-3139 TC |
| LISA WARNES HAWKINS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE FRANCHISE TAX BOARD, | ) | |
| A DIVISION OF THE GOVERNMENT OF | ) | |
| THE STATE OF CALIFORNIA; and the | ) | |
| UNITED STATES OF AMERICA, INTERNAL | ) | |
| REVENUE SERVICE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### MEMORANDUM DECISION

In this action, the Internal Revenue Service (IRS) and the California Franchise Tax Board (FTB) seek to have unpaid income tax liabilities excepted from the discharge that Debtors Trip and Lisa Hawkins received in their chapter 11 case. The IRS and the

FTB (collectively the Government) assert that the tax liabilities should not be discharged, because Debtors filed fraudulent returns, and because Debtors attempted to evade collection of tax. It is unnecessary to determine whether Trip Hawkins filed fraudulent returns, because I determine that he attempted to evade collection of tax by dissipating his assets on unnecessary and unreasonable expenditures while he knew he owed taxes and knew he was insolvent.[1] I determine that Lisa Hawkins neither filed fraudulent returns nor attempted in any way to evade tax.

BACKGROUND

A.    The Debtors

William M. "Trip" Hawkins (Trip) is a very sophisticated businessman. He received an undergraduate degree in Strategy and Applied Game Theory from Harvard College, and an M.B.A. from Stanford University. He was an early employee of Apple Computer, where he rose to director of marketing. In 1982, he left Apple and became one of the founders of Electronic Arts, Inc. (EA), which became the largest supplier of computer entertainment software in the world. By 1996, Trip had a net worth of approximately $100 million, primarily from his holdings of EA shares.

Lisa Hawkins (Lisa) married Trip in 1996. She received a B.A. in communications from Notre Dame de Namur University. Prior to her marriage, she worked as a leasing agent for a car dealership and prepared her own tax returns. After her marriage, she worked in the home and cared for the two children she had with Trip and the two children Trip had from his first marriage.

---

[1] This Memorandum Decision shall constitute the court's findings of fact and conclusions of law.

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 2 of 30

B.    The Tax Shelters

In 1990, EA created a wholly owned subsidiary, 3DO, for the purpose of developing and marketing the devices on which computer games are played.  Trip Hawkins left EA to run 3DO.  3DO went public in 1993.  In 1994, Trip began to sell large amounts of his EA common stock to invest heavily in 3DO.

In 1996, KPMG, the accounting firm that prepared Debtors' tax returns, advised Trip that Debtors would recognize very large capital gains upon the sale of the EA shares, and suggested an investment that would create capital losses that Debtors could use to offset those capital gains.  Pursuant to this advice, Debtors invested in a transaction called FLIP (Foreign Leveraged Investment Portfolio) in 1996, and invested in a transaction called OPIS (Offshore Portfolio Investment Strategy) in 1998.

FLIP worked in the following way.  In September 1996, Trip purchased 1,551 shares of the United Bank of Switzerland (UBS) for $1.5 million.  He also purchased an option to acquire shares of Harbourtowne, Inc. (Harbourtowne), a Cayman Islands corporation. At the same time, Harbourtowne contracted to purchase 30,750 shares of UBS treasury stock from UBS for $30 million.  UBS received an option to repurchase those shares before the sale closed.  UBS exercised that option, and the UBS shares were never transferred to Harbourtowne.  Trip received an opinion letter from KPMG stating that Trip could add to the tax basis of his UBS shares the $30 million Harbourtowne had contracted to pay for its UBS shares.  The KPMG opinion letter stated that it was more likely than not that UBS's repurchase of its shares would be considered a distribution to Harbourtowne (which was not taxable because Harbourtowne is a

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 3 of 30

foreign corporation), and that an appropriate treatment of this transaction would be to transfer Harbourtowne's basis in its UBS shares to Trip's basis in his UBS shares.

OPIS worked in a similar way. In October 1998, Trip purchased 9,200 shares of UBS for $1.99 million. He also purchased an option to acquire an interest in Hogue, Investors LP (Hogue), a Cayman Islands limited partnership. Hogue contracted to purchase 145,760 shares of UBS treasury stock for $40 million. Pursuant to a call option, UBS repurchased those shares before the shares were transferred to Hogue. Trip received opinion letters from KPMG and Brown & Wood stating that he could add to the tax basis of his UBS shares the $40 million Hogue had contracted to pay for its UBS shares.

Debtors claimed losses from the FLIP and OPIS shelters on their 1996-2000 tax returns. In December 1996, Trip sold 310 shares of UBS stock, and Debtors claimed resulting losses of $6,027,306. In December 1997, Trip sold the remaining 1,241 UBS shares involved in the FLIP transaction, and Debtors claimed resulting losses of $23,396,798. In December 1998, Trip sold 5,900 of the UBS shares involved in the OPIS transaction, and Debtors claimed resulting losses of $20,570,283. In December 1999, Trip sold an additional 1,000 UBS shares acquired in the OPIS transaction, and Debtors claimed resulting losses of $3,566,297. In December 2000, Trip sold the remaining 2,300 UBS shares acquired in the OPIS transaction, and Debtors claimed resulting losses of $8,244,602.

In July 2001, the IRS challenged the validity of basis-shifting tax shelters, such as FLIP and OPIS. In Notice 2001-45,

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 4 of 30

the IRS rejected the central concept upon which those tax shelters are based.  The IRS Notice states in substance that when a U.S. taxpayer owns shares of a foreign corporation, and also owns an interest in an offshore entity that holds shares of the foreign corporation, the U.S. taxpayer's basis in his shares should not be increased to include the offshore entity's basis in its shares of the foreign corporation when the offshore entity's shares are redeemed by the foreign corporation.

In July 2001, the IRS also commenced an audit of Debtors' 1997 tax return, focusing its inquiry upon the losses claimed from their transactions in UBS stock.[2]  The audit was later expanded to include Debtors' 1998, 1999, and 2000 tax returns.  Debtors immediately retained Hochman, Salkin, Rettig, Toscher & Perez, P.C. (Hochman), a law firm specializing in tax litigation, to represent them in the audit.  Hochman responded to several IRS requests for information regarding the FLIP and OPIS transactions.

In July 2002, the IRS Revenue Agent performing the audit of Debtors' returns sent Debtors' counsel a letter stating that the losses from the FLIP and OPIS transactions should be disallowed.

> [T]he Service has concluded that it has a strong case regarding this issue.  It is the position of the IRS that the claimed benefits from this transaction are not allowable.  The question of application of additions to tax, sometimes called penalties, is also being actively considered.

In October 2002, the IRS issued Announcement 2002-97, in which it described the terms upon which it would settle cases involving basis-shifting tax shelters, such as FLIP and OPIS.  The Announcement stated that settling taxpayers would be required to

---

[2] The 1996 return was not audited because the limitation period had already expired for that year.

concede 80 percent of the claimed losses, would be permitted to claim 20 percent of the claimed losses, and in appropriate cases would be relieved of certain penalties.

On November 27, 2002, Debtors' counsel wrote to the IRS, stating Debtors' intention to participate in this settlement program. On December 23, 2002, Debtors received a response from the IRS, stating that Debtors were not eligible for the settlement program, because one of the tax years in which Debtors claimed FLIP losses was no longer open to audit. In October 2003, Debtors' counsel asked that their request for participation in the settlement program be forwarded to the Appeals Division of the IRS.

C.   Debtors' Investment Losses

At the same time Debtors' tax woes were mounting, their investments began to go bad. By late 2002, 3DO, the company in which Debtors had invested almost all of the proceeds from the sale of their EA shares, was experiencing severe financial difficulty. In December 2002, Trip acknowledged that the company needed a large infusion of capital and that he was the only source from which the company could raise that capital. Between October 2002 and January 2003, Trip loaned 3DO approximately $12 million. In May 2003, 3DO filed a chapter 11 petition. In September 2003, Trip told his ex-wife that his 3DO shares were worthless. In November 2003, the 3DO bankruptcy was converted from a chapter 11 reorganization to a chapter 7 liquidation. Debtors never received any significant distribution from that liquidation.

D.   IRS Audit Report

In July 2003, IRS Revenue Agent John Barrett issued his audit report, which disallowed the vast majority of the losses that

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 6 of 30

1   Debtors had claimed from the sale of their UBS shares.  The report
2   stated that Debtors should not be allowed to add to the tax basis of
3   their UBS shares any amounts that Harbourtowne or Hogue contracted
4   to pay for their UBS shares.  The claimed basis transfer was
5   inappropriate, the report concluded, because Debtors were never at
6   risk regarding the shares that Harbourtowne and Hogue contracted to
7   purchase, because the transaction lacked economic substance and
8   business purpose apart from tax savings, and because a principal
9   purpose of the transaction was the evasion of federal income tax.
10  As a result of the disallowance of the FLIP and OPIS losses, the
11  audit report indicated that Debtors owed additional taxes and
12  penalties in the amount of $16 million for the years 1997-2000.[3]
13  E.    The Family Court Proceeding

14       On July 23, 2003, faced with the IRS audit report and
15  investment losses, Trip Hawkins filed a motion in the family court
16  to reduce the child support payments he was required to make to his
17  first wife.  He argued that he was entitled to such relief on the
18  basis of reduced income, investment losses, and large tax debts.  In
19  the papers submitted in support of this motion, Trip acknowledged
20  that he owed $25 million to the IRS and the FTB and that he was
21  insolvent as a result.  These representations are discussed in more
22  detail below.

23       The family court granted this motion in part, but at the same
24  time required Trip to place additional assets in a trust that had
25  been previously established for the support of the children.  The
26  court also imposed a judicial lien on all the assets of that trust,
27  to ensure that those assets could not be seized by taxing

28
   _____

        [3] The additional amount due by year was: $3,804,850 for 1997;
    $9,743,786 for 1998; $262,964 for 1999; and $2,214,673 for 2000.

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 7 of 30

authorities.  The genesis and terms of this transfer, which the Government relies upon to show Debtors' attempt to evade collection of tax, is also described in more detail below.

F.    Assessment of Additional Taxes

On December 30, 2004, Debtors consented to the assessment of the additional taxes and penalties shown on the IRS Audit Report. In March 2005, the IRS made an aggregate assessment of taxes, penalties, and interest for tax years 1997-2000 totaling $21 million.

On July 22, 2005, the FTB issued a Notice of Proposed Assessment, asserting that Debtors owed additional California state income taxes, penalties, and interest in the amount of $15.3 million for years 1997-2000.  These taxes were assessed shortly thereafter.

G.    Lawsuit Filed Against KPMG

In July 2005, Trip filed suit against KPMG in the San Mateo County Superior Court, alleging claims for fraud and professional negligence arising out of KPMG's recommendation that Debtors invest in the FLIP and OPIS shelters.  Trip later dismissed this action to participate in a federal class action suit brought against KPMG in the United States District Court in New Jersey.

Debtors never contemplated that their claims against KPMG would enable them to pay in full the tax liabilities arising out of the FLIP and OPIS shelters.  At a family court hearing in January 2004, Trip's bankruptcy counsel testified that the damages from such a suit would be limited to the amount of any tax penalties imposed on Debtors, because Debtors would have had to pay the principal amount of the tax due even if they had not been induced to invest in the shelters.  In the Disclosure Statement accompanying their chapter 11

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 8 of 30

1  plan, Debtors estimated that proceeds of the claims against KPMG
2  "may be as much as $3 million." Although the parties did not
3  introduce evidence as to the exact amount received in settlement of
4  Debtors' claims against KPMG, it appears that the recovery was not
5  materially in excess of the amount Debtors estimated in the
6  Disclosure Statement.

7  H.    Offer in Compromise

8      In October 2005, Debtors submitted an Offer in Compromise to
9  the IRS in which Debtors offered to pay the IRS $8 million over a
10  two-year period. Such an amount would have been equal to
11  approximately 38 percent of the amount that had been assessed by the
12  IRS earlier that year. In March 2006, an IRS official advised
13  Debtors' counsel that she could not recommend acceptance of Debtors'
14  Offer in Compromise. Debtors withdrew the Offer on March 23, 2006.

15  I.    Debtors' Lifestyle

16      From the time of their 1996 marriage onward, Debtors maintained
17  a lifestyle that was commensurate with the great wealth they enjoyed
18  at the time they were first married. In 1996, Debtors purchased a
19  home in Atherton, California for $3.5 million. In 2000, Debtors
20  purchased an $11.8 million private jet that they used for family
21  vacations as well as for business trips.[4] In 2002, Debtors
22  purchased an ocean-view condominium in La Jolla, California for $2.6
23  million. From the date of their marriage to the date of their
24  bankruptcy petition, Debtors employed various gardeners and
25  household attendants.

26      Debtors altered this lifestyle very little after it became
27  apparent in late 2003 that they were insolvent. Although they

28

---

[4] The aircraft was held by an entity wholly owned by Debtors.

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 9 of 30

sold the private jet in 2003, they continued to maintain both the Atherton house and the La Jolla condominium until July 2006. In October 2004, Debtors purchased a fourth vehicle costing $70,000.[5]

Debtors' personal living expenses exceeded their earned income long after Trip had acknowledged that Debtors were insolvent. In the Collection Information Statement accompanying their October 2005 Offer in Compromise, Debtors disclosed annual after-tax earned income of $150,000 and annual living expenses of more than $1.0 million.[6] In the schedules filed in their bankruptcy case in September 2006, Debtors disclosed annual after-tax earned income of $272,000 and annual living expenses of $277,000. The components of Debtors' living expenses are discussed in more detail below.

J.   Debtors' Bankruptcy Case

On September 8, 2006, Debtors filed a chapter 11 petition, primarily for the purpose of dealing with their tax obligations. Those tax obligations had been paid in part shortly before and after the bankruptcy petition. In July 2006, Debtors had sold their Atherton home, and the entire $6.5 million net proceeds had been paid to the IRS in partial satisfaction of its lien. In August 2006, the FTB had seized $6 million from Debtors' various financial accounts. Shortly after the petition date, Debtors sold the La Jolla condominium and paid the entire $3.5 million net proceeds to the IRS. Even with these payments, however, Debtors owed huge liabilities to both the IRS and FTB. The IRS filed a proof of claim in the bankruptcy case asserting that Debtors owed federal taxes in

---

[5] The family contained only two drivers. None of Debtors' children were old enough to drive.

[6] In addition to specific living expense items totaling $652,000, Debtors listed "other" living expenses totaling $487,000 annually.

the amount of $19 million after taking account of the recent $9.6 million payment.  The FTB filed a proof of claim asserting that Debtors owed state income taxes in the amount of $10.4 million after taking account of the FTB's recent seizure of $6 million.

Debtors proposed a plan of reorganization that provided for payment of part of the amount owed the IRS and FTB through: (1) a new-value contribution of $500,000; (2) Debtors' purchase of art and furnishings from the bankruptcy estate for $270,000;[7] (3) proceeds from the class action suit against KPMG; and (4) liquidation of the other assets of the estate.  The plan was confirmed on July 13, 2007.

The IRS acknowledges that it received payment of approximately $3.4 million through the bankruptcy case, and contends that it holds an unpaid claim of approximately $12 million afterwards.  The FTB, whose lien rights against Debtors' assets were junior to those of the IRS, received much less in the chapter 11 case.  It is not necessary to determine the exact amount due to either the IRS or the FTB, as the parties have sought only a determination as to whether the unpaid taxes, whatever their amount, should be excepted from discharge.

The discharge provisions of the confirmed plan state "The Hawkinses will be discharged from any debts that arose before the date of confirmation of the Plan to the extent provided by 11 U.S.C. Section 1141(d)," and that the Debtors, IRS, or FTB may bring suit to determine whether the unpaid tax debts were excepted from the discharge Debtors received.

---

[7] The new-value contribution and purchase of personal property were made through a loan obtained from Trip Hawkins' father.

**Memorandum Decision**                     -11-

K.   The Present Action

     On December 14, 2007, Debtors filed a declaratory relief action against the IRS and the FTB alleging that a dispute existed as to whether the tax liabilities not paid through the chapter 11 case (the Unpaid Taxes) were discharged, and seeking a determination that the Unpaid Taxes were in fact covered by the discharge entered by this court in October 2007.  The IRS and the FTB filed answers acknowledging the existence of the dispute, but asking this court to determine that the Unpaid Taxes were excepted from discharge pursuant to section 523(a)(1)(C) of the Bankruptcy Code.[8]

DISCUSSION

I.
Fraudulent Returns

     The Government first contends that the Unpaid Taxes should be excepted from discharge on the basis that Debtors filed fraudulent returns for the years in which those liabilities arise.  § 523(a)(1)(C).  The Government contends that the 1997-2000 returns were fraudulent, because Debtors knew that they could not properly claim losses from the FLIP and OPIS shelters to offset gains from the sale of their EA shares.

     It is a difficult question whether Trip Hawkins acted with intent to defraud in filing the returns in question.  An objective, well-trained tax professional would have known that the claimed loss deductions lacked substance and would not be upheld if challenged.  Trip Hawkins clearly has the financial acumen to understand why the FLIP and OPIS losses should not be allowed, and once the IRS

_____

[8] All statutory references are to the United States Bankruptcy Code, Title 11 of the United States Code.

**Memorandum Decision**                    -12-

1  challenged the deductions, Debtors never contended that the
2  deductions were valid, and immediately tried to opt into a
3  settlement program that would have allowed them only a small portion
4  of the losses they claimed in their returns.  At the same time,
5  however, the FLIP and OPIS shelters were extremely complicated, and
6  at the time Trip signed the returns in question, he held opinion
7  letters from tax professionals stating that it was more likely than
8  not that the claimed deductions would be upheld.  These opinion
9  letters were themselves so long and complex that they helped to
10 disguise the lack of substance in the FLIP and OPIS transactions.

11     The court need not, and does not, decide whether Trip Hawkins
12 acted with intent to defraud regarding 1997-2000 returns.  As
13 explained below, the Unpaid Taxes should be excepted from discharge
14 on the basis that Trip caused Debtors to make unreasonable
15 discretionary expenditures for an extended period of time after he
16 became aware of tax obligations that he knew he could not pay.

17     There is no evidence that Lisa Hawkins signed the 1997-2000
18 returns with fraudulent intent.  To establish such intent, the
19 Government would have to show that she knew that Debtors could not
20 properly claim losses from the FLIP and OPIS transactions.  The
21 Government introduced no evidence that Lisa had any understanding of
22 those very complex transactions.

23                              II.
                Willful Attempt to Evade Tax
24

25 A.    Introduction

26     The Government next contends that the Unpaid Taxes should be
27 excepted from discharge, because Debtors willfully attempted to
28 evade the collection of those taxes.  Section 523(a)(1)(C) excepts

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 13 of
30

from discharge any debt "with respect to which the debtor . . . willfully attempted in any manner to evade or defeat such tax."

The Government contends that Debtors attempted to avoid collection of these taxes by maintaining an extravagant lifestyle while not paying a known tax liability, by making fraudulent transfers of assets, by failing to disclose assets on their bankruptcy schedules, by making an inadequate offer in compromise to the IRS, and by concealing their plan to file bankruptcy.

For the reasons stated below, the court finds that the Unpaid Taxes should be excepted from discharge with respect to Trip Hawkins, because he willfully avoided the collection of tax by making unreasonable and unnecessary discretionary expenditures at a time when he knew he owed taxes and knew he would be unable to pay those taxes. The court determines that the Unpaid Taxes should not be excepted from discharge with respect to Lisa Hawkins, because the Government failed to show that she understood the Debtors' financial condition or significantly influenced their spending.

B. Legal Standard

The elements that the Government must establish to show a willful attempt to evade or avoid tax are summarized well in U.S. v. Jacobs:

> Section 523(a)(1)(C) "contains a conduct requirement (that the debtor 'attempted in any manner to evade or defeat [a] tax'), and a mental state requirement (that the attempt was done 'willfully')." "The government satisfies the conduct requirement when it proves the debtor engaged in affirmative acts to avoid payment or collection of the taxes", either through commission or culpable omission. The mental state requirement - willfulness - is satisfied where the government shows that the debtor's attempt to avoid tax liability was "done voluntarily, consciously or knowingly, and intentionally." That standard is met where "(1) the debtor had a duty under the law, (2) the debtor knew he had that duty, and (3) the debtor voluntarily and intentionally violated that duty."

Memorandum Decision                    -14-

U.S. v. Jacobs, (In re Jacobs), 490 F.3d 913, 921 (11th Cir. 2007)
(citations omitted).

The necessary "affirmative act," or "culpable omission" may
consist of failure to file returns,[9] concealment of income,[10]
fraudulent transfer or concealment of assets,[11] or unnecessary
expenditures.[12]

The requirement that the taxpayer act voluntarily, consciously,
and intentionally "prevents the application of the exception [from
discharge] to debtors who make inadvertent mistakes," but does not
require the government to establish fraudulent intent.  Jacobs, 490
F.3d at 924.

Numerous decisions have held that unnecessary expenditures
combined with nonpayment of a known tax can be the basis for
excepting that tax from discharge.

> [T]he caselaw applying section 523(a)(1)(C) has
> consistently held section 523(a)(1)(C)'s requirements to
> be satisfied in situations where the debtor-even without
> fraud or evil motive-has prioritized his or her spending
> by choosing to satisfy other obligations and/or pay for
> other things (at least for non-essentials) before the
> payment of taxes, and taxes knowingly are not paid.

Lynch v. U.S. (In re Lynch), 299 B.R. 62, 64 (Bankr. S.D.N.Y. 2003);
accord Jacobs 490 F.3d at 925-27; Stamper v. U.S. (In re Gardner),

---

[9] See, e.g., U.S. v. Fretz (In re Fretz), 244 F.3d 1323, 1329-
30 (11th Cir. 2001); U.S. v. Fegeley (In re Fegeley), 118 F.3d 979,
984 (3rd Cir. 1997).

[10] See, e.g., Jacobs, 490 F.3d at 926-27; Wright v. IRS (In re
Wright), 191 B.R. 291, 293-95 (S.D.N.Y. 1995); U.S. v. Swenson (In
re Swenson), 381 B.R. 272, 299-300 (Bankr. E.D. Cal. 2008); Hamm v.
U.S. (In re Hamm), 356 B.R. 263, 285 (Bankr. S.D. Fla. 2006).

[11] See, e.g., Jacobs, 490 F.3d at 925-27; Dalton v. IRS, 77
F.3d 1297, 1302-04 (10th Cir. 1996).

[12] Discussed in detail in text below.

**Memorandum Decision**                    -15-

1  360 F.3d 551, 560-61 (6th Cir. 2004); Wright, 191 B.R. at 293; Hamm,

2  356 B.R. at 285-86.

3      Courts have used the following language to explain the logic

4  and limits of the doctrine under which a tax debt may be rendered

5  nondischargeable because the debtor pays other creditors or

6  purchases luxuries instead of paying taxes.

7      This Court starts with the recognition that as numerous
       cases have recognized, "nonpayment of tax alone is not
8      sufficient to bar discharge of a tax liability." . . .
       [I]n nearly every bankruptcy case in which taxes are due,
9      some income came in that was spent somewhere, in some way.
       Reconciling that with the principle that nonpayment alone
10     does not constitute evasion requires the recognition that
       at least part of one's income can be spent on living
11     without running afoul of the deemed evasion that results
       from electing to spend one's money on purchases or
12     obligations other than taxes, *so long as it fairly can be
       regarded as non-discretionary.*

13  Lynch, 299 B.R. at 84 (footnotes omitted)(emphasis added).

14
       [I]t is not necessary to prove that the debtor was
15     inspired by "bad purpose or evil motive" in failing to pay
       his taxes.  It is enough if the debtor "had the
16     wherewithal to file his return and pay his obligation,"
       but "voluntarily, consciously, and intentionally" decided
17     to pay other creditors instead.

18  Wright, 191 B.R. at 293 (citations omitted).

19     [B]oth Debtors admit to having knowledge of their tax
       liabilities since at least 1995.  In the face of that
20     knowledge, they continued to spend money on various
       luxuries rather than on their mounting federal income tax
21     liabilities.  This spending demonstrated a decision made
       by the Debtors to favor self-indulgence over their tax
22     debts.  That decision was voluntarily and knowingly made
       by the Debtors.

23
   Hamm, 356 B.R. at 285-86.

24

25  C.  Culpability of Trip Hawkins

26     The Government has met the required burden with respect to Trip

27  Hawkins by establishing that for more than two and one-half years

28  before filing for bankruptcy protection, he caused Debtors to make

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 16 of
30

unnecessary expenditures in excess of Debtors' earned income, while he acknowledged that Debtors had a tax liability of $25 million, while he relied upon that tax liability in seeking a reduction of child support payments, while he knew Debtors were insolvent, while Debtors paid other creditors,[13] and while Debtors planned to file bankruptcy to discharge their tax obligations.

1. <u>Knowledge of tax liability</u>.

By January 2004, Trip Hawkins had acknowledged in writing several times that Debtors owed federal and state income taxes in the amount of $25 million. In November of 2002, with the advice of expert tax counsel, he sought to accept an IRS settlement offer that would fix Debtors' federal and state tax liability at $25 million.[14] In July 2003, he sought a reduction in child support payments to his ex-wife on the basis of that liability. In September 2003, in an e-mail to the ex-wife, he estimated his tax liability at $25 million. In January 2004, he filed a brief in support of a motion to reduce child support that stated in relevant part: "[Hawkins'] debts include . . . a $25,000,000.00 bill for Federal and State of California income taxes. The tax bill has been issued after an offer from the Internal Revenue Service was accepted by Mr. Hawkins."

---

[13] Debtors' schedules listed no unpaid general unsecured claims.

[14] Hawkins attempted to opt into a settlement program established by the IRS under which the taxpayer would concede 80 percent of the claimed loss deduction and the government would recognize the remaining 20 percent of the claimed loss. The calculation of federal and state tax liability at $25 million was calculated on the assumption that Hawkins would be permitted to claim 20 percent of the loss under the settlement program.

Case: 07-03139    Doc# 49    Filed: 04/23/10    Entered: 04/23/10 13:11:19    Page 17 of 30

In January 2004, Trip Hawkins' tax counsel filed a declaration in support of the motion to reduce child support that stated in relevant part:

> The total amount that we anticipate that the Taxpayers will owe the IRS as of today's date is equal to $4,375,949.00; $11,295,412.00; $305,152.00; and $2,500,771.00 for the years 1997 through 2000, respectively. Thus, we estimate the Taxpayers' liability to the IRS to exceed $18,000,000.00.
>
> In addition, the FTB continues to seek their share of the liability. For FTB purposes, the Taxpayers are not eligible for the federal settlement initiative. Based upon this information, it is estimated that the Taxpayers may owe the FTB an amount equal to approximately forty percent (40%) of the IRS liability. Thus, it appears that exposure to the FTB liability will exceed $7,000,000.

It is likely that Trip Hawkins understood that he owed millions in taxes well before January 2004. In closing argument, his counsel acknowledged that Trip understood by November 2002 that Debtors would be liable for the taxes claimed by the IRS and FTB. It is worthy of note that at no time since the IRS challenged the FLIP and OPIS shelters in July 2001 has Hawkins asserted that the losses Debtors claimed through those shelters were allowable under law.

2.  <u>Knowledge of Insolvency.</u>

By January 2004, Trip Hawkins also knew his liabilities exceeded his assets, and that any dissipation of his assets would reduce his ability to pay his tax liabilities. In the January 2004 brief in support of his motion to reduce child support, Hawkins openly acknowledged that he was insolvent: "At this time, [Hawkins'] assets are about $20,867,000.00 . . . and his debts include a $4,000,000.00 house loan and a $25,000,000.00 bill for Federal and State of California income taxes."

The testimony of Hawkins and his bankruptcy attorney at the January 2004 family court hearing indicates that Hawkins *planned* not

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 18 of
30

1  to pay the tax debt in full.  Hawkins testified that he had accepted
2  the IRS settlement offer, which would result in a liability of $18
3  million to the IRS.[15]  Immediately after this testimony, Hawkins'
4  bankruptcy attorney testified that Hawkins' intent was not to pay
5  the tax debt, but to discharge it in bankruptcy.  "What we're
6  looking for is the ability to discharge the tax, in other words, to
7  eliminate the tax liability at some point in the future so that Mr.
8  Hawkins can be freed from that tax."  Hawkins' bankruptcy attorney
9  then testified at length about the timing of the planned bankruptcy
10 filing.[16]  Following the hearing, Hawkins' bankruptcy attorney asked
11 that the order issued by the family court not include any reference
12 to the planned bankruptcy petition, to minimize the likelihood that
13 the bankruptcy petition would be found to be filed in bad faith.[17]
14 3.  Discretionary Expenditures.

15     Before examining Hawkins' expenditures, it is appropriate to
16 examine Hawkins' earned income.  For the purpose of this decision,
17 this court assumes that it should take some account of a debtor's
18 earned income in determining what expenditures are culpable under
19 section 523(a)(1)(C) as unduly lavish.  It may not be appropriate to
20 require a CEO earning hundreds of thousands of dollars per year to
21 live in an apartment suitable for a clerical employee, even if that
22 CEO is insolvent.  The effort and skill required to earn such sums

23
24     [15] As noted above, Debtors' tax counsel assumed that a
       liability to the IRS of $18 million would result in an additional
25     liability to the FTB of $7 million.

26     [16] The bankruptcy attorney explained that the taxes could not
       be discharged unless the petition was filed at least three years
27     after the latest return was filed and at least 240 days after the
       taxes had been assessed.  See §§ 507(a)(8) and 523(a)(1)(A).

28     [17] The attorney may have been concerned that the bankruptcy
       court might refuse to confirm Debtors' chapter 11 plan on the basis
       that its primary purpose was the avoidance of tax.  See § 1129(d).

**Memorandum Decision**                    -19-

require a nuanced approach in determining what living expenses are necessary.[18] Even the most nuanced approach, however, does not excuse living expenses greatly in excess of earned income over an extended period of time.[19]

Debtors provided two snapshots of their income and expenses between January 2004 and September 2006. In October 2005, Debtors submitted a Collection Information Statement, signed under penalty of perjury, in support of their Office in Compromise. In September 2006, Debtors filed schedules in their chapter 11 case, also signed under penalty of perjury. The October 2005 Collection Information Statement indicated monthly after-tax earned income of $12,500. Bankruptcy Schedule I indicated monthly after-tax earned income of $22,180. All of this income was earned by Trip; Lisa was not employed outside the home at any time during this period.

Against this backdrop, the Debtors' personal living expenses from January 2004 to September 2006 are truly exceptional. After Trip represented to the family court that he was liable for $25 million in federal and state taxes and that he was insolvent as a result, Debtors spent between $16,750 and $78,000 more than their after-tax earned income each month.

---

[18] The court should not afford similar weight to unearned income in evaluating the culpability of expenditures by a taxpayer who knows he is insolvent. Such a taxpayer is not "working for his creditors," as the unearned income would be available to those creditors in any event. Although at one time the value of Debtors' stock holdings were inextricably intertwined with Trip Hawkins' active occupation, the evidence suggests that by 2004, his unearned income consisted primarily of dividends from UBS stock, which were not dependent in any way upon Trip Hawkins' current personal efforts.

[19] A taxpayer who suffers a sudden decline in income may, of course, need some time to adjust his or her expenditures.

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 20 of 30

In the Collection Information Statement submitted in October 2005, Debtors stated that their personal living expenses were more than seven times their after-tax earned income, and exceeded that income by more than $78,000 per month.

| | |
|---|---|
| After-tax earned income[20] | $12,468 |
| Food, clothing, misc. | ($7,000) |
| Housing and utilities | ($33,600) |
| Transportation | ($2,700) |
| Health care | ($700) |
| Child care | ($4,500) |
| Life insurance | ($1,650) |
| Other expenses | ($40,550) |
| Total Expenses | ($90,700) |
| Income less expenses | ($78,232) |

Several aspects of this Statement are worthy of note. The $33,600 housing expense included expenses for a 5-bedroom, 5.5 bath house in Atherton (later sold for $10.5 million), and a 4-bedroom, 3.5 bath condominium in La Jolla (later sold for $3.5 million). The transportation expense covers four vehicles for a family with only two drivers, and includes a $70,000 Cadillac SUV purchased ten months after Trip Hawkins had acknowledged Debtors' tax liability and insolvency in the family court proceeding. The $40,550 for "other expenses" is not broken down. If that figure is exaggerated, the exaggeration may itself represent an effort to prevent the collection of tax.

---

[20] Wages of $16,668 less income and FICA taxes of $4,200.

Case: 07-03139    Doc# 49    Filed: 04/23/10    Entered: 04/23/10 13:11:19    Page 21 of 30

The schedules filed in Debtors' bankruptcy case indicate that Debtors' personal living expenses greatly exceeded their after-tax earned income until just before they filed their bankruptcy petition in September 2006. Debtors sold the Atherton house just before the bankruptcy petition was filed. Debtors sold the La Jolla condominium after the bankruptcy petition was filed. If one adds the minimum amount they could have been spending for housing before the July 2006 sale of the Atherton house, together with the income and living expenses that Debtors reported in their bankruptcy schedules, Debtors' living expenses greatly exceeded their after-tax earned income through July 2006.

| | |
|---|---|
| After-tax earned income[21] | $22,638 |
| Housing expense[22] | ($24,583) |
| Utilities & maintenance | ($1,615) |
| Food | ($3,500) |
| Clothing, laundry & cleaning | ($450) |
| Medical | ($700) |
| Recreation & entertainment | ($1,100) |
| Life insurance | ($825) |
| Transportation[23] | ($2,328) |

---

[21] Salary and consulting fees of $24,567 less payroll and Social Security taxes of $2,029.

[22] Monthly mortgage payment on Atherton house of $19,500, plus minimum possible real estate taxes on Atherton house of $2,917 per month, plus minimum monthly real estate taxes on La Jolla condominium of $2,166 per month (monthly property tax calculated at 1/12 of 1 percent of original purchase price). This figure does not include any amount for fire insurance, and undoubtedly underestimates property taxes.

[23] Includes auto insurance, loan payments on the SUV, and operating expenses.

Memorandum Decision                    -22-

| | |
|---|---|
| Child care | ($3,800) |
| Education | ($150) |
| Storage | ($800) |
| Total Expenses | ($39,851) |
| Income less expenses | ($17,213) |

Debtors made expenditures in excess of earned income for more than two-and-one-half years after Trip Hawkins acknowledged in January 2004 that Debtors were insolvent and would not pay their tax debt in full. Debtors did not sell the Atherton home until July 2006. They did not sell the La Jolla condominium until after filing for bankruptcy protection in September 2006.[24] They reported in their bankruptcy schedules that on the petition date they were still making the expenditures for the Cadillac SUV, child care, and recreation noted above. Debtors' high level of expenditure also continued well after they consented to assessment of tax by the IRS in the amount of $21 million in December of 2004, and well after the assessments were recorded in March 2005. The Collection Information Statement indicates that Debtors' monthly living expenses were seven times their earned income ten months after they consented to assessment and seven months after the IRS formally assessed the additional tax. This is not a case where the taxpayers acted appropriately once the tax was formally assessed, perhaps suggesting that their earlier failure to pay was based on some innocent misconception of their duty.

---

[24] Neither Debtor testified that they tried to sell either house promptly after January 2004 but were unable to do so.

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 23 of 30

D.    Culpability of Lisa Hawkins

     The actions, knowledge, and intent of Trip Hawkins do not by themselves require that the Unpaid Taxes be excepted from the discharge granted Lisa Hawkins.  Bad acts by one spouse are not automatically attributed to the other spouse for the purpose of determining whether a debt should be excepted from discharge. Allison v. Roberts, (In re Allison), 960 F.2d 481, 485-86 (5th Cir. 1992); La Trattoria, Inc. v. Lansford (In re Lansford), 882 F.2d 902, 904-05 (9th Cir. 1987); Synod of South Atlantic Presbyterian Church v. Magpusao (In re Magpusao), 265 B.R. 492, 498-99 (Bankr. M.D. Fla. 2001).  Bad acts by one spouse may be considered in determining the responsibility of the other spouse, where the other spouse knowingly participates in the bad acts and accepts the benefits derived from those bad acts.[25]  Lansford, 822 F.2d at 905; Magpusao, 265 B.R. at 500-01; Rainier Title Co. v. Demarest (In re Demarest), 176 B.R. 917, 922-23 (Bankr. W.D. Wash. 1995).

     The Government has not met its burden of showing that Lisa Hawkins willfully made unnecessary expenditures while not paying a known tax liability.  The evidence indicates instead that Lisa reasonably deferred to Trip regarding all significant financial decisions, and that it was he who is responsible for all of Debtors' actions with respect to the tax liabilities in question.  In so finding, I note the following.

     First, Trip and Lisa had very different levels of financial expertise and experience, and played very different roles in the

---

     [25] One spouse can be vicariously liable for bad acts of the other spouse committed in furtherance of a business partnership including both spouses.  Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa), 287 B.R. 515, 523-27 (9th Cir. BAP 2002).  That principle is inapplicable in this case, as there is no evidence of a business partnership including Trip and Lisa Hawkins.

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 24 of 30

family. Trip had a Stanford M.B.A., worked full time as the CEO of a publicly traded company, and had at one time accumulated $100 million through his own efforts and investments. Lisa had only an undergraduate degree in communications, had very limited business experience, and during the entire period of her marriage to Trip had been a full-time, stay-at-home mother and wife. These facts and circumstances indicate that it was Trip who managed all significant aspects of the family finances, that it was Trip who decided what the family could afford to spend, and that Lisa deferred to Trip's expertise and experience on all financial matters. Trip and Lisa's testimony at trial reinforced this picture.

Second, the most damaging evidence of evasion, Trip's representations in his motion to reduce child support payments to his ex-wife, do not implicate Lisa. It was in that motion that Trip acknowledged his tax liability, his resulting insolvency, and his intent to discharge rather than pay his tax liabilities. There is no evidence that Lisa participated in that motion or was otherwise aware of the representations Trip made in that motion.

Third, the Government did not examine Lisa in detail regarding her role in decision making regarding family finances, her knowledge of the family's financial condition, or her knowledge of Trip's decision not to pay taxes while maintaining the family's previous standard of living. The Government established through its questioning of Lisa only that she knew of the tax audit, that she participated in some undefined way in the preparation of the Collection Information Statement, and that it was she who purchased the $70,000 SUV in October 2004. Lisa testified that she paid no attention to financial issues not directly concerned with the immediate operation of the household, and that even the household

1  bills were generally paid by Trip's personal assistant.  I find this
2  testimony credible.
3       The evidence taken as a whole indicates that it was Trip who
4  was in every meaningful sense responsible for Debtors' failure to
5  pay tax while making unnecessary personal expenditures.
6  E.    Other Alleged Acts of Evasion
7       In support of its contention that Debtors willfully attempted
8  to avoid collection of tax, the Government relies upon other alleged
9  acts of avoidance that are more problematic.  I give little or no
10 weight to the evidence of other acts of willful avoidance discussed
11 below.
12      The Government contends that Trip Hawkins intentionally used
13 the family court proceedings to transfer property to the Hawkins
14 Family Support Trust (the Trust) for the purpose of shielding those
15 assets from taxing authorities.  The record of those proceedings
16 does not support this claim.  Trip brought a motion to reduce his
17 child support payments on the basis of his investment losses and tax
18 liability.  In the course of opposing that motion, the attorney for
19 Trip's ex-wife urged that Trip be required to place additional funds
20 in the Trust, and that the assets of the Trust be shielded from
21 Debtors' tax liabilities by requiring Trip to make the Trust
22 irrevocable and by placing a judicial lien on Trust assets.  Trip's
23 counsel opposed this request.  It is true that after the family
24 court judge granted the ex-wife's request, Hawkins' counsel
25 cooperated fully in drafting an order implementing that ruling.
26 This record does not show, however, that Hawkins willfully
27 transferred property to the Trust with the intent of frustrating the
28 collection of tax.

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 26 of
30

The Government next contends that the Unpaid Taxes should be excepted from discharge, because Debtors planned from January 2004 onward to discharge those liabilities, and because they submitted an inadequate Offer in Compromise to delay the Government's collection efforts while Debtors waited for their tax liabilities to become old enough to be subject to discharge. This evidence does show that Debtors intended to discharge rather than pay the Unpaid Taxes. That by itself, however, does not justify a finding that Debtors willfully attempted to avoid the collection of tax. The Unpaid Taxes should be excepted from Trip's discharge, not because Debtors made a decision to file bankruptcy long before they actually did so, but because Trip caused them to waste assets through unnecessary personal spending after they decided to discharge their tax liabilities.

The Government urges the court to rely upon Debtors' personal use of their private jet as the centerpiece of their lavish personal spending. I attach little importance to ownership of the jet, because Debtors purchased the jet while they thought they were solvent, and they attempted to sell it soon after they understood they were insolvent.

I also decline to rely upon the Government's argument that Debtors attempted to evade tax by making high-risk loans to 3DO shortly before that company filed for bankruptcy. I agree that a pattern of high-risk investments can constitute evidence of an attempt to evade payment of tax. A debtor who has $100 in assets and owes $100 in debts acts inappropriately towards his creditors by buying $100 in lottery tickets. While Debtors' loans to 3DO were somewhat like buying lottery tickets, in that they imposed on the

Government most of the risk of loss while affording Debtors most of the benefits of success, the evidence of evasion of tax via unnecessary spending is so strong against Trip that the loans to 3DO add little to the Government's case, and there is no evidence that Lisa played any role in the loans to 3DO.

Finally, I am unconvinced that Debtors intentionally failed to disclose their San Francisco Giants seat license,[26] and I consider it wholly irrelevant that Debtors were able to maintain a high standard of living post-bankruptcy by purchasing furniture and artworks from the bankruptcy estate with money borrowed from Trip Hawkins' father.

F.   Conclusion

The Government introduced no evidence that Lisa Hawkins signed the 1997-2000 returns knowing that Debtors could not properly claim losses from the FLIP and OPIS shelters.  The Government did not establish that Lisa attempted to evade tax through excessive personal expenditures, because it failed to show she had any understanding of the extent of the couple's tax liability, that she knew of Trip's plan not to pay that tax liability, or that she exercised significant influence upon the family's expenditures.

Trip Hawkins willfully evaded payment of that tax debt within the meaning of section 523(a)(1)(C) by causing Debtors to deplete their assets on large unnecessary expenditures for an extended period of time, while knowing that Debtors were insolvent, while

---

[26] Although Debtors did not specify that they held a seat license, they did disclose in their schedules ownership of season tickets.  This conduct is not persuasive evidence of intent to deceive, and is very different from that involved in the cases cited by the Government in which there was a complete failure to list either the seat license or tickets along with failure to disclose many other assets.  See In re Blow, 2007 WL 1858697 (Bankr. S.D. Tex. 2007) and In re Gordon, 2002 WL 925028 (Bankr. M.D.N.C. 2002).

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 28 of 30

knowing that Debtors had a $25 million tax debt that they could not
pay and did not intend to repay, and while paying other creditors.

It is true that the present case does not exhibit all the
badges of tax evasion present in the majority of decisions in which
courts have found a willful attempt to evade or defeat tax. In the
more typical case in which the court relies upon luxury
expenditures, there are other indices of evasion not present here:
failure to file returns; concealment of income; failure to pay the
amount shown on the returns; or transfer of assets without
consideration. Lynch, 299 B.R. at 83 n.96. I have considered those
decisions carefully and I conclude that no specific type or number
of badges of evasion is required. The statute itself does not
require the presence of any badges of evasion; their sole function
is as evidence of an intentional, culpable act or omission whereby
tax is willfully evaded. In the present case, there is ample
evidence of both the conduct requirement and mental-state
requirement, and there is evidence of willful failure to pay tax not
found in the more typical cases noted above: Trip's exceptional
business sophistication; Trip's open acknowledgment of his tax debt
and insolvency; the length of time over which Trip caused Debtors to
expend funds on unnecessary expenditures after he acknowledged the
tax debt; the amount of unnecessary expenditures; and the extent to
which unnecessary expenditures exceeded Debtors' earned income.

Both parties agree that this court may not order that the
Unpaid Taxes be excepted from discharge in part. Whether those
liabilities are excepted from discharge is an all-or-nothing
question. This is so, because section 523(a)(1)(C) does not provide
that an unpaid tax debt is excepted from discharge only "to the

Case: 07-03139   Doc# 49   Filed: 04/23/10   Entered: 04/23/10 13:11:19   Page 29 of
30

extent that" such debt results from the willful avoidance of tax. Lynch, 298 B.R. at 87-88. Although the amount lost to the IRS and FTB as a result of Debtors' excessive discretionary spending is less than the amount of the debt excepted from discharge, the amount lost was far from immaterial. Debtors' personal living expenses exceeded their earned income by $516,000 to $2.35 million between January 2004 and the petition date.[27]

CONCLUSION

Trip Hawkins' income tax liabilities to the IRS and FTB for tax years 1997-2000 are excepted from discharge pursuant to section 523(a)(1)(C) of the Bankruptcy Code. Lisa Hawkins' liabilities for the Unpaid Taxes are not excepted from discharge.

**\*\*END OF MEMORANDUM DECISION\*\***

---

[27] Monthly personal living expenditures exceeded earned income by $17,213 to $78,232 per month (see pages 21-23, above). Using those monthly figures, Debtors' personal living expenditures exceeded earned income by a total of $516,390 to $2.35 million over the 30 months between January 2004 and July 2006 (when they sold the Atherton house). The $2.35 million figure uses the income and expenses shown in the Collection Information Statement signed by both Debtors and submitted to the IRS in support of Debtors' Offer in Compromise. In the two months between the date Debtors sold the Atherton house and the petition date, expenditures exceed earned income, but by a smaller amount.